### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOHN MILLER | : | |
| | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:07-CV-943 (JCH) |
| | : | |
| v. | : | |
| | : | |
| HARTFORD FIRE INSURANCE CO., | : | JULY 2, 2009 |
| | : | |
| Defendant. | : | |

**RULING RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 29)**

Plaintiff John Miller brings this action against his former employer, Hartford Fire

Insurance Co. ("the Hartford").  Miller alleges that the Hartford harassed and

discriminated against him in the terms and conditions of his employment, and that the

Hartford unlawfully terminated his employment because of his age and in retaliation for

opposing discrimination in his workplace and for filing a charge of age discrimination

with the Connecticut Commission on Human Rights and Opportunities ("CHRO.").

Miller brings his claims pursuant to the Age Discrimination in Employment Act of 1967

("ADEA"), 29 U.S.C. §§ 621 et seq., and the Connecticut Fair Employment Practices

Act ("CFEPA"), Conn. Gen. Stat. §§ 46a-60 et seq.  The Hartford has filed a Motion for

Summary Judgment (Doc. No. 29).  For the reasons that follow, the defendant's Motion

is GRANTED in Part and DENIED in Part.

I.    **FACTUAL BACKGROUND**[1]

Miller commenced employment with the Hartford on April 7, 1975, and was employed there for over thirty years.  Affidavit of John Miller, Pl.'s Ex. 3, at ¶ 4 (hereinafter "Miller Aff."); Deposition of John Miller at 20, Def's Ex. A (hereinafter "Miller Dep.").  At all times relevant to this case, Miller held the position of Outside Automotive Service Representative ("ASR"), known colloquially as an appraiser.  Def.'s Local Rule 56(a)(1) Statement at ¶ 1 (hereinafter "Def.'s 56(a)(1)").  Miller's primary job responsibility was to conduct physical examinations of Hartford-insured vehicles and prepare appraisals documenting the damage to the vehicle and the cost of repairs.  Def.'s 56(a)(1) at ¶ 2.  Miller was supervised by Don Yellen, his "Team Leader."  Id. at ¶ 3.  Yellen's immediate superior was Gary Kemp, Auto Physical Damage Claim Manager.  Miller Dep. at 67; Deposition of Gary Kemp, Pl.'s Ex. 23 / Def.'s Ex. D, at 23 (hereinafter "Kemp Dep.").  Kemp's immediate superior was Clyde Douglas, Regional Vice President.  Deposition of Clyde Douglas, Def.'s Ex. E / Pl.'s Ex. 27, at 18, 33-34, 47 (hereinafter "Douglas Dep.")  Douglas's immediate superior was Glen Shapiro, Vice President of Auto and General Liability.  Douglas Dep. at 33-34; Deposition of Glenn Shapiro, Def.'s Ex. F / Pl.'s Ex. 26, at 11 (hereinafter "Shapiro Dep.").  Pam Stevens, who was involved in Miller's termination, was a Senior HR Consultant.  Deposition of Pam Stevens, Pl.'s Ex. 25 / Def.'s Ex. C, at 19, 94-95 (hereinafter "Stevens Dep.").

The Hartford purported to measure ASRs' performance and efficiency in part by the number of vehicles inspected per day and the accuracy of their appraisals.

---

[1]For the purposes of the instant motion, the court accepts facts undisputed by the parties as true and resolves disputed facts in favor of the plaintiff where there is evidence to support his allegations.

Def.'s 56(a)(1) at ¶ 4; Pl.'s Local Rule 56(a)(2) Statement at ¶ 4 (hereinafter "Pl.'s 56(a)(2)").  However, the general standards applied to ASRs were sometimes varied at the local level to account for differences in the geographic area covered by individual ASRs.  See Deposition of Don Yellen, Pl.'s Ex. 21 / Def.'s Ex. B., at 207-08 (hereinafter "Yellen Dep.").

Miller was in the United States Air Force Reserves.  Miller Dep. at 10-12.  From 2001 to 2005, Miller was called up for active duty, and did not work at the Hartford.  Id. at 13-14.  After being retired due to age from the Reserves, on August 4, 2005, Miller returned to the Hartford.  Miller Dep. at 64-65.  On February 1, 2006, Miller received a written evaluation from his supervisor, Don Yellen.  Def.'s 56(a)(1) at ¶ 8.

On August 19, 2006, Douglas sent an email to Stevens, with the subject matter, "People Threat Analysis."  Pl.'s Ex. 16.  The email requested a list of employees, with each one classified "as a turnover threat or not."  Id.  On August 21-22, 2006, Stevens put together a report of employees for Douglas.  Id.; Pl.'s Ex. 17.  Stevens asked Kemp to identify any employees under his span of control who he felt were "vulnerable from a turnover perspective."  Pl.'s Ex. 17.  Kemp responded and noted with regard to Miller, "eligible for retirement - will be put on written warning for performance."  Pl.'s Ex. 18. Miller had never expressed a desire or intention to retire to Kemp or anyone else. Kemp Dep. at 75; Miller Aff. ¶ 18.

On or about September 8, 2006, Miller was called to a meeting with Yellen, Kemp, and an individual named Lori Hitchery.  Def.'s 56(a)(1) at ¶ 12.  He was issued a first written warning entitled, "Performance Improvement Report First Written Warning." Id.; Pl.'s Ex. 7.  Miller had never received a written warning in his entire thirty-one year

3

career at the Hartford.  Miller Aff. ¶ 8.  At this meeting, Miller was given the option of

attempting to improve his performance under an action plan or receiving a severance

package from Hartford.  Def.'s 56(a)(1) at ¶ 12.  At various times, Hartford has offered

employees who receive a written warning or final written warning the option to accept

severance pay rather than continue with the progressive discipline process.  Stevens

Dep. at 52-57.

        The warning identified several areas of deficiency: "Substandard productivity,"

"Substandard quality," and "Insufficient substantiation and explanation for hours

worked."  Pl.'s Ex. 7.  It noted Miller's productivity results and quality results as

compared to departmental productivity and quality goals.  Id.  According to Yellen, the

Department Productivity Goal contained in the warning was not an appropriate goal for

Miller given his coverage area, but the warning did not reflect this fact.  Yellen Dep. at

207-08; but see id. at 263 (stating that the standard was reasonable).

        The Hartford employee handbook includes a progressive discipline policy, with

the following steps: (1) verbal warning; (2) written warning; (3) final written warning; (4)

termination.[2]  Stevens Dep. at 28, 41; Pl.'s Ex. 12.  If Miller accepted the option of

attempting to improve his performance, the First Written Warning gave him two months

to accomplish certain improvement goals.  Pl.'s Ex. 7.  It provided that if he did not meet

the warning's terms, he would be placed on "final warning," consistent with the

progressive discipline policy.  Id.  Yellen, Miller's immediate superior, believed that

---

[2]Miller did not receive a verbal warning in connection with his discipline in 2006.  Although the
Hartford maintains that he received a verbal warning in 2001, Miller denies ever having been informed of
the verbal warning.  Miller Aff. ¶ 13.

4

Miller could increase his productivity and performance quality while on the performance improvement plan.  Yellen Dep. at 250-51.  Stevens testified that the purpose of such a warning was to rehabilitate, that is, to improve an employee's performance such that he gets "back on track" and can be successful.  Stevens Dep. at 43.

Miller reviewed the Separation Agreement provided to him, and initially considered leaving the Hartford.  Miller Aff. ¶ 10.  However, believing that the Hartford was wrongly attempting to force him out on the basis that he was an older employee, he decided to remain employed there and to file a charge with the Connecticut Commission on Human Rights and Opportunities.  Id. ¶ 11.  By memorandum dated September 27, 2008, Miller notified his employer that he was rejecting the severance package.  Def.'s 56(a)(1) at ¶ 14.  He stated that, not withstanding his opinion of how he had been treated, he would continue to work "to the best of [his] abilities" and would dedicate his "efforts to the best interests of the Company."  Pl.'s Ex. 9.

On September 29, 2006, Kemp informed Human Resources personnel that John Miller "will not retire" and that Miller "also decided to pursue a discrimination claim" with the "Connecticut Human Rights Organization" [sic].  Pl.'s Ex. 29.  The email message, whose subject was, "John Miller Rescinds Retirement Decision," was passed along to Douglas, who expressed surprise to Stevens, the Senior HR Consultant.  Id.  In response to the message that Miller "will not retire," Stevens wrote to Douglas:

> I need to see where this leaves us.  He was on a warning for performance and was going to take the 1/2 severance package with a release.  It sounds like he has opted not to do that.  No issue with the claim.  We have done the right things by him.  I will touch base with Gary and ER to see if he is still leaving or if he is going to make us fire him.

Pl.'s Ex. 29.

5

On October 11, 2006, the Hartford generated a "Performance Improvement Outline" detailing Miller's performance against several standards and stating that the term of Miller's First Written Warning would be extended two weeks, to November 22, 2006.  Def.'s Ex. O.  This document was never provided to Miller.  Miller Dep. at 198-200.

On October 17, 2006, Miller filed a charge of discrimination with the Connecticut Commission on Human Rights and Opportunities.  Miller Aff. ¶ 12; id. at Ex. D.

On or about October 27, 2006, Yellen conducted a reinspection of a 2004 Pontiac Grand Prix that Miller had appraised as a "total loss."  Def.'s 56(a)(1) at ¶ 16. Miller had not opened the car's hood during the original appraisal.  Id. at ¶ 17; Pl.'s 56(a)(2) at ¶ 17.  Miller had determined in his appraisal that the transmission was damaged, and that the repair costs exceeded the designated value of the vehicle. Def.'s 56(a)(1) at ¶ 17; Pl.'s 56(a)(2) at ¶ 17.  Therefore, Miller found the vehicle was a total loss.  Def.'s 56(a)(1) at ¶ 17; Pl.'s 56(a)(2) at ¶ 17.  In his re-inspection report, Yellen indicated that the transmission was not damaged, that Yellen was able to locate a necessary replacement part at a junkyard, which part Miller had been unable to locate, and that, in Yellen's view at that time, the car was not a total loss.  Def.'s Ex. M. Yellen noted, however, that the vehicle would have to be "torn down" in order to determine if it had sustained additional damage.  Id.  Yellen asked Miller to come to the salvage yard and reinspect the car with him, which Miller did.  Miller Dep. at 205-07. Miller disputes Yellen's findings and maintains that the car was not repairable.  Miller Dep. at 205-06.  He denies any wrongdoing and denies having admitted to any wrongdoing.  Miller Aff. ¶ 17.

6

Yellen reported his reinspection findings to Kemp, who in turn reported them to Douglas.  Kemp. Dep. at 211-15; Douglas Dep. at 54-55.  Kemp informed Douglas that Miller's appraisal, according to Yellen, included damage not found during the reinspection.  Douglas Dep. at 54-55. Douglas directed Kemp to reinspect the vehicle himself, and Kemp did so and agreed with Yellen's view of the damage.  Id. at 55-56. Douglas reported to his superior, Shapiro, that it was Kemp's belief that Miller had included non-existent damage in an appraisal for the purpose of turning the car into a total loss.  Douglas Dep. at 83-85.

On January 2, 2007, Yellen sent an email detailing Miller's progress in October and November to Kemp, who in turn passed it along to employee relations investigator Jennifer Ames, in-house attorney Stephen Harris, Douglas, and Stevens.  Pl.'s Ex. 13. The email stated that there had "been slight improvement, though not at the level expected of an ASR with John's experience."  Id.

At a meeting attended by Stevens, Douglas, and Shapiro, with Harris and Ames consulting by telephone, the Hartford decided to terminate Miller's employment. Stevens Dep. at 94-96; Douglas Dep. at 91-92; Shapiro Dep. at 51-52; Deposition of Jennifer Ames, Def.'s Ex. G / Pl.'s Ex. 24, at 139, 141 (hereinafter "Ames Dep.").  The termination was effective January 15, 2007.  Def.'s 56(a)(1) at ¶ 27.

The Hartford's stated basis for Miller's termination was that he had violated Hartford's code of conduct when he included non-existent damage in the appraisal. Def.'s 56(a)(1) at ¶ 26; Def.'s Mem. at 12.  Miller's immediate supervisor, Yellen, did not believe that Miller's conduct warranted termination, thought termination was an overly harsh response to the situation, and informed Gary Kemp that he disagreed with the

7

decision to terminate Miller.  Yellen Dep. at 308-09, 316-17.  Kemp did not participate in the decision to terminate Miller but was simply informed, by Stevens, that Miller was being terminated.  Kemp Dep. at 246-47.  In spite of her September 29, 2006 email referencing firing Miller, Stevens testified at her deposition that she did not become involved in the termination process until after issues with the appraisal arose at the end of October.  Stevens Dep. at 58-59, 70, 118, 128.

At no time during Miller's tenure did he hear anyone make derogatory remarks about any employee's age, nor did he hear rumors of such remarks.  Def.'s 56(a)(1) at ¶ 28.

## II.    STANDARD OF REVIEW

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000).

Once the moving party has met its burden, in order to defeat the motion the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a factfinder to find in her favor, Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

When assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought.  Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38.  "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party."  Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000).

8

"When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence presented, the question must be left to the factfinder.  Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

### III.   ANALYSIS

Miller brings each of his claims pursuant to both state and federal law. Connecticut courts look to federal employment discrimination precedent in analyzing claims brought pursuant to the Connecticut Fair Employment Practices Act.  See Levy v. Comm'n on Human Rights and Opportunities, 236 Conn. 96, 103 (1996).  At oral argument, the parties agreed that the same standards apply to Miller's state and federal claims.  This court will analyze Miller's federal and state law claims together.

### A.   Counts One and Four: Harassment / Discrimination in the Terms and Conditions of Employment

Miller claims that the Hartford harassed and discriminated against him in the terms and conditions of his employment in violation of the Age Discrimination in Employment Act (ADEA) and Connecticut Fair Employment Practices Act (CFEPA).[3]

"In order to survive summary judgment on a claim of hostile work environment harassment, a plaintiff must produce evidence that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment."  Cruz v. Coach Stores, Inc., 202 F.3d

---

[3]Miller's Complaint does not make clear whether Counts One and Four are limited to hostile work environment (harassment) claims.  However, in his Opposition, aside from his termination and retaliation claims, Miller presses only harassment claims.  At oral argument, Miller's counsel confirmed that the sole basis of his claim in Counts One and Four was hostile work environment.

560, 570 (2d Cir. 2000) (internal citations and quotation marks omitted).  A victim must

also subjectively perceive the environment to be abusive.  See Terry v. Ashcroft, 336

F.3d 128, 148 (2d Cir. 2003).  Whether or not a work environment is hostile must be

determined by examining the totality of the circumstances.  Id. at 148.  The Supreme

Court and Second Circuit have identified the factors that courts are to consider in

determining whether a hostile work environment exists:

> Among the factors to consider when determining whether an environment is
> sufficiently hostile are "the frequency of the discriminatory conduct; its severity;
> whether it is physically threatening or humiliating, or a mere offensive utterance;
> and whether it unreasonably interferes with an employee's work performance."
> . . . "As a general rule, incidents must be more than episodic; they must be
> sufficiently continuous and concerted in order to be deemed pervasive."

Terry, 336 F.3d at 148 (quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 23 (1993);

Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002)).  In attempting to demonstrate the

existence of these factors, Miller highlights several actions undertaken by the Hartford.

In particular, he contends that he was subjected to unwarranted discipline, put on a

performance improvement plan with inappropriate objectives, and falsely and wrongly

accused of misrepresentations, inflating numbers, theft, and fraud.  He also contends

that the Hartford pressured him to retire and humiliated him in front of his coworkers.

The actions that Miller identifies do not support a claim of hostile work

environment.  These actions boil down to two episodes: first, Miller's receipt of a written

warning and offer of a severance package, and second, his termination.  The hostile

events surrounding the two episodes, taken together, cannot be characterized as

sufficiently frequent or continuous to be considered pervasive.  Similarly, the evidence

in the record does not reveal frequent or continuous activity that altered the conditions

of Miller's employment.  Nor can the episodes properly be considered "severe."  While a rational trier of fact could conclude that Miller's expectations of work were affected by the Hartford placing him on a performance improvement plan, and that Miller felt humiliated by the discipline to which he was subject and his eventual termination, the Hartford's actions cannot be considered to have created a hostile work environment. Finally, there is no evidence that the discipline interfered with Miller's work performance; in fact, the performance improvement plan appears to have led to improvement.  See Pl.'s Ex. 13.

Miller has not created a genuine issue of fact as to his harassment claims.  The court GRANTS the Hartford's Motion for Summary Judgment as to those claims (Count One and Count Four)

B.    Counts Two and Five: Unlawful Termination on the Basis of Age

Miller claims that he was terminated on the basis of his age in violation of the Age Discrimination in Employment Act (ADEA) and Connecticut Fair Employment Practices Act.  The ADEA makes it unlawful, inter alia, for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age . . . ."  29 U.S.C. § 623(a)(1).  In the recent decision of Gross v. FBL Financial Services, Inc., the Supreme Court explained that to prevail on an ADEA disparate treatment claim, a plaintiff must prove "that age was the 'but-for' cause of the challenged adverse employment action."  129 S. Ct. 2343, 2352 (2009).

11

Claims under the ADEA are governed by the three-step burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 511 U.S. 792 (1973).[4]  See D'Cunha v. Genovese/Eckerd Corp., 479 F.3d 193, 194-95 (2d Cir. 2007).  First, the plaintiff must establish a prima facie case of discrimination.  Id. at 195.  To do so, the plaintiff must adduce sufficient evidence to permit a rational trier of fact to find that (1) he was a member of the protected age group; (2) he was qualified for the job at issue; (3) the defendant took an adverse employment action against the plaintiff; (4) the adverse action occurred under circumstances giving rise to an inference of discrimination.  Id. at 195 (citing Terry v. Ashcroft, 336 F.3d 128, 137-38 (2d Cir. 2003)). The Second Circuit has "often emphasized [that] the burden of establishing this prima facie case in employment discrimination cases is 'minimal.'"  McGuinness v. Lincoln Hall, 263 F.3d 49, 53 (2d Cir. 2001).  Nonetheless, the plaintiff still has some burden to come forward with sufficient admissible evidence.  See Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 65 (2d Cir. 1997).

Second, if the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant to articulate a legitimate non-discriminatory reason for the termination.  D'Cunha, 479 F.3d at 195.  Third, if the defendant meets this burden, the plaintiff may no longer rely on the presumption raised by the prima facie case and "must prove by a preponderance of the evidence (which may be direct or circumstantial), that

---

[4]In its recent decision in Gross, the Supreme Court noted that the Supreme Court "has not definitively decided" whether the McDonnell Douglas framework, first developed in the context of Title VII cases, "is appropriate in the ADEA context."  129 S. Ct. at 2349 n.2.  In the absence of further direction from the Supreme Court, this court must follow Second Circuit precedent, which applies the McDonnell Douglas framework to ADEA claims.  See D'Cunha v. Genovese/Eckerd Corp., 479 F.3d 193, 194-95 (2d Cir. 2007).

12

age was the 'but-for' cause of the challenged employer decision." Gross, 129 S. Ct. at 2351.

The Hartford does not dispute the first three elements of the prima facie case, but challenges Miller's ability to establish the fourth element, which is whether Miller's termination occurred under circumstances giving rise to an inference of discrimination. See Def.'s Mem. at 19.  In establishing the fourth element, Miller relies chiefly on references by decision-makers to his retirement in emails, and seeks to link those references to his ultimate termination.  The Hartford relies upon two cases which, it asserts, stand for the proposition that age discrimination cannot necessarily be inferred from references to retirement.  See Hazen Paper Co. v. Biggins, 507 U.S. 604 (1993); Criley v. Delta Air Lines, Inc., 119 F.3d 102 (2d Cir. 1997).  In Hazen, the Supreme Court considered the question of "whether an employer violates the ADEA by acting on the basis of a factor, such as an employee's pension status or seniority, that is empirically correlated with age."  507 U.S. at 608.  The Court noted that the ADEA's purpose was to require employers to evaluate older employees "on their merits and not their age," and that "[i]t is the very essence of age discrimination for an older employee to be fired because the employer believes that productivity and competence decline with old age."  Id. at 610.  By contrast, when an employer's decision is "wholly motivated by factors other than age, the problem of inaccurate and stigmatizing stereotypes disappears."  Id. at 611.  The Court therefore held that a claim could not succeed if the employer was motivated by something other than the employee's age.  Id. at 609.  In Criley, the Second Circuit analyzed whether an airline that declined to hire pilots approaching the federally-mandated retirement age, out of concern of the economics of

13

doing so, violated the ADEA.  119 F.3d at 105.  Looking to Hazen, the court held that

because the airline's concerns were economically motivated and there was no evidence

reflecting any "age-based stereotype or belief that older pilots are less competent than

younger ones," the airline did not violate the ADEA.  Id.

      Both Hazen and Criley stand for the proposition that the ADEA prohibits only

discrimination because of age, not discrimination based upon other factors that may

correlate with age.  Hazen and Criley do not, however, stand for the proposition that

references to a factor correlated with age, such as retirement, cannot be evidence of

age discrimination; instead they simply hold that if the evidence shows that the

employer was motivated by such a factor rather than age, that the employer's actions

are not actionable under the ADEA.  See Hazen, 507 U.S. at 612-613 (noting that an

employer who intentionally uses a factor such as pension status as a proxy for age may

be found liable under the ADEA); Criley, 119 F.3d at 105.  Hazen and Criley are

therefore distinguishable from the instant case, in which Miller alleges that the

references to retirement were a proxy for age.

      The Second Circuit has explained that "[a]n inference of discriminatory intent

may be established by, inter alia, . . . 'the sequence of events leading to the plaintiff's

discharge.'"  Sassaman v. Gamache, 566 F.3d 307, 312 (2d Cir. 2009) (citations

omitted).  The court agrees with Miller that a rational trier of fact could infer

discriminatory intent based on age from the sequence of events leading up to Miller's

firing.

      First, at the outset of the events in this case, an exchange of emails on August

19 and August 22, 2006 between Douglas, Kemp, and Stevens generated a list of

14

employees that specifically identified Miller as "eligible for retirement," even though Miller had never expressed a desire or intention to retire.  At his deposition, Gary Kemp, who generated the annotation on the list, initially had difficulty explaining why Miller would have been identified in this way.  See Kemp Dep. at 75-76.  Although he subsequently explained that the "eligible for retirement" notation was simply based upon Miller's service time with the company, see id. at 83-85, a rational jury could conclude that the annotation referencing both retirement and the written warning meant that Miller would be put on a written warning for performance because of his eligibility for retirement—that is, as a pretext to get him to leave.  That warning, which came a couple of weeks later on September 8, included the option to take a severance package.  Miller was warned that this would be his only chance to get a severance package, and Miller reasonably concluded that being put on written warning meant he was at risk of being fired.  While the Hartford has provided selected employees with the option to take a severance package in conjunction with a first or final written warning, viewing the facts in the light most favorable to Miller, a rational jury could find (in light of how Miller was labeled on the list) that Miller was disciplined in order to pressure him into accepting severance.

Second, on September 29, when Miller declined to accept the severance package, Stevens wrote to Douglas about Miller's decision, and said, "I will touch base with Gary and ER to see if he is still leaving or if he is going to make us fire him."  Pl.'s Ex. 29.  The email's subject line referred to Miller's "Retirement Decision."  This second exchange of emails occurred between the same individuals—Douglas, Stevens, and Kemp—that had exchanged the initial list in August labeling Miller as eligible for

15

retirement.  <u>See</u> Pl.'s Exs. 16-17.  Stevens and Douglas also went on to be two of the three principal participants in Miller's termination.  The second exchange of emails could further support a jury's conclusion that Miller's discipline, and ultimate termination, all formed part of an extended effort to end his employment with the Hartford.  A jury could infer from the fact that the Hartford made references to Miller's retirement in both August and September, and then offered the written warning and severance that ostensibly had no relation to "retirement," that the Hartford sought to force Miller out on the basis of his age.

Third, just under a month after the exchange of emails on October 27, Yellen reinspected a vehicle that Miller had appraised as a total loss and found fault with the appraisal.  Even putting aside that Miller denies any wrongdoing, Yellen testified that he did not believe that Miller's conduct in relation to the appraisal warranted termination.  Still, Stevens, Douglas, and Shapiro focused on the appraisal and found that it was sufficient cause to skip the remaining steps in the progressive discipline process and terminate Miller in January 2007.

The Hartford insists that the earlier progressive discipline process had no bearing on the ultimate decision to terminate Miller and that his dismissal was not performance-related.  Def.'s Reply at 5-6.  The Hartford contends that there is a lack of evidence linking the progressive discipline process and the reinspection, and as a result that Miller's claims must fail.  Counsel also contends that because there is no evidence of age-based animus on the part of Yellen, and Yellen initiated the reinspection that eventually resulted in Miller's termination, that it would be logically flawed to find a link between any earlier animus on the part of Stevens or Kemp and Miller's ultimate

16

termination several months later.

While a jury may ultimately find the Hartford's version of events persuasive, the court disagrees with counsel's assertion that there is no genuine issue of material fact. A rational jury could find, given the closely-spaced sequence of events, that Stevens and Douglas had determined by August 2006 that they wanted to terminate Miller's employment on the basis of his age.  It could further conclude that when their efforts to force Miller to take a severance package did not succeed, Stevens and Douglas took advantage of the first "opportunity" they had to terminate Miller for "cause" soon thereafter.  For purposes of summary judgment, Miller has sufficiently established the fourth element of the prima facie case.

The burden then shifts to the Hartford to articulate a legitimate non-discriminatory reason for the termination.  Hartford claims that Miller was terminated because he included unobserved and non-existent damage on an appraisal.  This claim is supported by evidence, including deposition testimony about the appraisal itself and about the decision-making process leading to Miller's termination.  A rational trier of fact, if it credits this evidence and the Hartford's characterization of Miller's conduct, could conclude that the Hartford had an honest belief that Miller had engaged in conduct warranting termination.  The Hartford has thus met its burden of production under McDonnell Douglas's second step.

The court must therefore examine the record to determine whether Miller could satisfy his burden of persuasion on the ultimate issue.  Relying on the same evidence that supports an inference of discriminatory intent, Miller could meet this burden. Viewed in the light most favorable to Miller, the evidence could support a conclusion

17

that the Hartford's stated reason was pretextual, and that the Hartford planned to remove Miller as an employee, and ultimately did remove him, on the basis of his age.

Finally, Miller has also denied that he misrepresented non-existent damage or admitted to making intentional representations.  Hartford argues that as long as the employer has an honest belief in its proffered nondiscriminatory reason, it may prevail even if that reason is factually mistaken.  However, Miller has proffered other evidence, separate from the appraisal matter, that the decision-makers planned to remove him as an employee, and ultimately did terminate him, on the basis of his age.  A rational trier of fact could credit Miller's interpretation of the email exchanges in August and September and their references to his "retirement."  If it did so, it could determine that the Hartford terminated Miller's employment on the basis of his age.  Further, the trier of fact could so determine even if it concludes that the Hartford's decision-makers genuinely believed that Miller had made misrepresentations on his appraisal, since it could conclude that the Hartford used the misrepresentations as a pretext to terminate him on the basis of age.  Other issues of fact—inconsistencies in who ultimately made the termination decision, the fact that Miller's immediate boss did not believe that his conduct warranted termination, the absence of a policy requiring termination in situations like Miller's, disputes over the extent of Stevens's involvement, and the inappropriateness of Miller's performance reviews—further support this court's conclusion that summary judgment is inappropriate because there are genuine issues of fact to be tried.  Accordingly, the court DENIES the Hartford's Motion for Summary Judgment as to Count Two and Count Four.

18

C.      Counts Three and Six: Unlawful Termination in Retaliation for Protected
         Activity

To establish a prima facie case of retaliation under the ADEA or CFEPA, a

plaintiff must adduce sufficient evidence to permit a rational trier of fact to find that (1)

he participated in protected activity; (2) the defendant was aware of that activity; (3) the

defendant took a materially adverse action against the plaintiff; and (4) a causal

connection exists between the protected activity and the adverse action—that is, that a

retaliatory motive played a role in the adverse action.  Kessler v. Westchester County

Dep't of Soc. Servs., 461 F.3d 199, 205-206 (2d Cir. 2006); Jute v. Hamilton

Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005).  If the plaintiff meets the initial

burden of these four elements, the burden shifts to the employer to articulate a

legitimate reason for its actions.  Jute, 420 F.3d at 173.  If the employer articulates a

legitimate reason, then the burden shifts back to the plaintiff to prove that the adverse

employment action was motivated by retaliation.

Miller clearly satisfies the first element.  It is not disputed that Miller participated

in protected activity: he complained to his employer of discrimination, and he filed a

CHRO complaint on October 17, 2006.  Miller also satisfies the second element.

Kemp, Stevens, and Douglas were aware of Miller's plan to file a CHRO complaint.

See Pl.'s Ex. 29.  Miller also satisfies the third element: his employment was

terminated.

The fourth element requires more extensive analysis, but Miller can also satisfy

that element.  To establish the fourth element, Miller need only put forth evidence of

retaliatory animus or motive related to his termination.  "[P]roof of causation can be

19

shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." Gordon, 232 F.3d at 117 (citing Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir. 1993) (citations omitted)).  To establish causality by temporal proximity alone, the proximity between the protected activity and the adverse employment action must be very close.  See Clark County School Dist. v. Breeden, 532 U.S. 268, 273-74 (2001). The Second Circuit has explained, however, that "[a]n inference of discriminatory intent may be established by, inter alia, . . . 'the sequence of events leading to the plaintiff's discharge.'"  Sassaman, 566 F.3d at 312 (citations omitted).  Evidence of a series of events that links the protected activity to the adverse action, even where those events occur across an extended period of time, may be sufficient to create an issue of fact even where no single event could form the basis of a retaliation claim.  See, e.g., McInnis v. Town of Weston, 375 F. Supp. 2d 70, 85 (D. Conn. 2005) (acts occurring over a seven-month period); see also Jute, 420 F.3d at 170, 177 (concluding that in deciding whether an issue of fact as to retaliation exists, a court may consider a series of retaliatory acts that occurred over a two year period preceding an actionable adverse employment action, even when those acts themselves are not actionable on statute of limitations grounds).

Miller has offered adequate evidence of both a temporal link and of retaliatory animus.  The process that set his termination in motion began in close proximity to his filing of a CHRO claim.  Most significantly, Stevens sent an email directly linking Miller's

20

decision to file a CHRO claim to the Hartford's proposal to terminate him.  <u>See</u> Pl.'s Ex. 29.  The email, which referenced the CHRO claim and questioned whether Miller was going to "make us fire him," is sufficient to demonstrate retaliatory animus on the part of the Hartford for purposes of establishing a prima facie case.[5]  <u>Id.</u>

The court has already concluded that Hartford has articulated a legitimate reason for its actions—that Miller acted unethically in creating the "inflated" appraisal. The burden therefore shifts back to Miller to offer evidence from which a rational trier of fact could conclude that he has met his burden of persuasion on the ultimate issue in the case.

Miller has met his burden to create a triable issue of fact on his retaliation claim. The September 29 email exchange alone creates an issue of fact.  On that date, Miller declined to accept the severance package.  Kemp wrote to Brenda Quesnel, who passed the email along to Douglas and Stevens, to inform her that Miller "will not retire" <u>and</u> that he had decided to pursue a CHRO claim.  Douglas than wrote to Stevens, stating, "Do what?"  Stevens then replied to Douglas.  Stevens made reference to Miller's decision not to take the severance package and his filing of the CHRO claim. She then stated, "I will touch base with Gary and ER to see if he is still leaving or if he is going to make us fire him."  Pl.'s Ex. 29.  A rational jury could conclude from the email reference to Miller's declining his severance package, the filing of the CHRO claim, and the fact that the participants in the email exchange ultimately became the decision

---

[5]At oral argument, the Hartford's counsel conceded that Stevens may have had retaliatory animus, but contended that there was no link between that animus and Miller's ultimate firing.  The court disagrees, as it discusses at length, <u>infra</u>.

makers who played key roles in Miller's termination, that Miller was terminated in retaliation for his filing of a claim.   A rational jury could also conclude that Douglas's expression of shock, "Do what?," was in reaction to Miller's filing of a CHRO claim. Douglas's reaction further buttresses Miller's claim that the Hartford retaliated against him when it terminated him.   At the very least, the email exchange creates a triable issue of fact as to whether Miller's termination was motivated by retaliatory animus.

Miller was ultimately terminated several months later, on the ostensible basis of an appraisal that occurred less than a month after the September 29 exchange of emails.   As discussed supra, the Hartford maintains that the earlier progressive discipline process had no bearing on the decision to terminate Miller.   Def.'s Reply at 5-6.   The Hartford contends that as a result, Miller's claims of retaliation must fail.   At oral argument, counsel for the Hartford conceded that Stevens's email of September 29 would create an issue of fact as to retaliatory animus on the part of Stevens.   However, counsel also contended that because there is no evidence of retaliatory animus on the part of Yellen, and Yellen initiated the reinspection that eventually resulted in Miller's termination, that there was no link between Stevens's animus on September 29 and Miller's ultimate termination several months later.

The court disagrees with counsel's assertion that there is no genuine issue of material fact.   Given the closely-spaced sequence of events, a rational trier of fact could find that Stevens and Douglas decided, after Miller filed his CHRO claim, that he would be terminated, and that they took advantage of the first opportunity they had to terminate him for "cause."   This conclusion would be further supported by Yellen's testimony that Yellen did not believe Miller's conduct warranted termination, even in

light of Miller's earlier performance problems.  Defendants have not offered evidence of

a policy providing that immediate termination was the appropriate response to Miller's

actions.  A rational trier of fact could conclude that the decision-makers exaggerated

the seriousness of Miller's conduct as a pretext for terminating him, in light of Miller's

thirty-one year history at the Hartford, the lack of any evidence of improper motive on

Miller's part, and the fact that Miller's alleged actions in regard to the total loss

appraisal, while denominated a "theft," did not result in any financial gain to Miller.  In

short, summary judgment is inappropriate because there are genuine issues of fact to

be tried.  Accordingly, the court DENIES the Hartford's Motion for Summary Judgment

as to Count Three and Count Six.

## IV.    CONCLUSION

For the foregoing reasons, defendant Hartford Fire Insurance Company's Motion

for Summary Judgment (Doc. No. 29) is GRANTED IN PART as to plaintiff John Miller's

harassment claims (Counts One and Four) and DENIED IN PART as to Miller's claims

for unlawful termination on the basis of age (Counts Two and Five) and in retaliation for

filing a complaint of discrimination (Counts Three and Six).


**SO ORDERED.**

Dated this 2nd day of July, 2009, at Bridgeport, Connecticut.


 /s/ Janet C. Hall_____
Janet C. Hall
United States District Judge

23